**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **UNIVERSAL CITY STUDIOS LLC,**<br><br>*Plaintiff,*<br><br>v.<br><br>**MAEDTFWE1X, *et al.*,**<br><br>*Defendants.* | **SEALED**<br><br>Civil Action No. |

# Declaration of Monique Cheng Joe

**DECLARATION OF MONIQUE CHENG JOE**

I, Monique Cheng Joe, declare and state as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2. I am the Senior Vice President, Head of Brands and Content Intellectual Property, for NBCUniversal. Plaintiff Universal City Studios LLC ("Plaintiff") is an American film production and distribution company, and is a division of NBCUniversal, one of the world's leading media and entertainment companies. I am knowledgeable about Plaintiff's business activities, business records, products, trademarks, and copyrights owned by Plaintiff. I make this declaration from matters within my own knowledge save where otherwise stated.

3. Plaintiff's most successful film franchises include the Despicable Me and Fast & Furious franchises, and their library also includes individual films such as Jaws and E.T. (collectively, the "Universal Films").

4. Products sold under the Universal brand and associated with the Universal Films include items such as apparel, accessories, appliances, bedding, books, toys, food and beverages, and souvenirs (collectively, the "Universal

Products"). Universal Products are distributed and sold to consumers throughout the United States through authorized retailers and websites, such as Walmart, Target, and Hot Topic, the official shop.universalorlando.com website, and Plaintiff's Amazon store.

5. The Despicable Me franchise began in 2010 with the film *Despicable Me*, which was followed by three sequels, *Despicable Me 2* (2013), *Despicable Me 3* (2017), and *Despicable Me 4* (2024), and by two spin-off prequels, *Minions* (2015) and *Minions: The Rise of Gru* (2022). It is the highest-grossing animated film franchise, with over $5.6 billion grossed worldwide. The protagonist of the Despicable Me franchise is Gru, who is the adoptive father of three little girls and the boss of the Minions. Minions perpetually serve the most despicable masters of the time. Some of the characters and character names made famous by the Despicable Me franchise include:

| **Gru** | **Margo** | **Edith** | **Agnes** |
|---|---|---|---|
|  |  |  |  |

| Stuart | Kevin | Bob | Dave |
|---|---|---|---|
|  |  |  |  |

6. Copyrighted works associated with the Despicable Me franchise are registered with the United States Copyright Office. The registrations include but are not limited to: “Despicable Me” (Reg. No. PA0001685728), “Despicable Me 2” (Reg. No. PA0001859348), “Despicable Me 3” (Reg. No. PA0002043544), “Despicable Me 4” (Reg. No. PA0002478457), “Minions” (Reg. No. PA0001952355), and “Minions: The Rise of Gru” (PA0002369070). Plaintiff has also registered the following marks with the United States Patent and Trademark Office:

| Registration Number | Trademark |
|---|---|
| 4,522,438<br>4,522,437<br>4,419,214<br>4,515,131<br>4,605,902<br>4,354,512 | DESPICABLE ME |
| 6,169,993<br>6,456,114 | IT'S SO FLUFFY |
| 4,918,817<br>5,059,956<br>4,846,779<br>5,176,741 | MINIONS |

| | |
|---|---|
| 5,166,771<br>5,129,447<br>5,055,079<br>5,129,446 | DESPICABLE ME MINION MADE |
| 4,592,054<br>4,592,051<br>4,592,052<br>4,596,147 |  |

7. The Fast & Furious franchise is centered on a series of action films that depicts a world of street racing, heists, and spies. The first film, *The Fast and The Furious*, was released in 2001. Since then, nine more movies have been released, and the series has become Plaintiff's biggest franchise and the eighth highest-grossing film series of all time, with a combined gross revenue of over $7 billion worldwide. The franchise universe expanded with the six-season animated television series *Fast & Furious Spy Racers*, which premiered in 2019. Plaintiff has used the famous Fast & Furious name for many years and has registered the following marks with the United States Patent and Trademark Office:

| **Registration Number** | **Trademark** |
|---|---|
| 2,854,465 | THE FAST AND THE FURIOUS |
| 5,276,717 | FAST & FURIOUS |

| | |
|---|---|
| 5,697,522<br>5,428,676<br>5,546,145<br>5,428,677 | |
| 6,069,963<br>6,731,983<br>6,731,984<br>6,731,985 | FAST & FURIOUS SPY RACERS |
| 7,762,741 | FAST X |

8. Jaws is a franchise series that started with a thriller film directed by Steven Spielberg and released in the summer of 1975. The first film follows a police chief, a marine biologist, and a fisherman set out to hunt and kill a great white shark that is terrorizing a small beach town of Amity Island and killing several of its residents. The first film was a box-office success and won several awards for its ingenious production and memorable soundtrack, including the Academy Awards for Best Film Editing, Best Original Dramatic Score, and Best Sound. The first film was followed by three sequels: Jaws 2, Jaws 3-D, and Jaws: The Revenge. Plaintiff has used the famous Jaws name for many years and has registered the following marks with the United States Patent and Trademark Office:

| **Registration Number** | **Trademark** |
|---|---|
| 1,100,741<br>2,276,097<br>2,316,903<br>6,791,161<br>7,139,772<br>7,426,341 | JAWS |

| | |
|---|---|
| 6,294,711<br>6,294,707 | YOU'RE GONNA NEED A BIGGER BOAT |
| 1,075,059 | JAWS |
| 1,073,671 | JAWS |

9. E.T. the Extra-Terrestrial (or E.T. for short) is a 1982 science fiction film. It follows the story of an alien that befriends ten-year-old Elliott Taylor and is stranded on Earth. The film was produced and directed by Steven Spielberg and won several Academy Awards, including Best Original Score and Best Visual Effects. Plaintiff has used the E.T. name for many years and has registered the following marks with the United States Patent and Trademark Office:

| **Registration Number** | **Trademark** |
|---|---|
| 1,314,299<br>1,390,935<br>2,772,224 | E.T. |
| 1,312,269<br>1,346,436 | E.T. THE EXTRA-TERRESTRIAL |

10. True and correct copies of the United States Registration Certificates for the trademarks associated with the Universal Films and listed in the tables above (collectively, the "Universal Trademarks") are attached hereto as **Exhibit 1**. The U.S. registrations for the Universal Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065.

11. The Universal Trademarks are distinctive when applied to the Universal Products, signifying to the consumers that the products originate from Plaintiff and are manufactured to Plaintiff's high-quality standards. Whether Plaintiff manufactures the products itself or licenses others to do so, Plaintiff has ensured that products bearing its trademarks are manufactured to the highest quality standards.

12. The Universal Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1) and have been continuously used and never abandoned. The innovative marketing and product designs of the Universal Products have enabled the Universal brand to achieve widespread recognition and fame and have made the Universal Trademarks some of the most well-known marks in the entertainment industries. The widespread fame, outstanding reputation, and significant goodwill associated with the Universal Films have made the Universal Trademarks invaluable assets of Plaintiff.

13. Plaintiff has expended substantial time, money and other resources in advertising and promoting the Universal Trademarks. In fact, Plaintiff has expended millions of dollars in advertising, promoting, and marketing featuring the Universal Trademarks. Universal Products have also been the subject of extensive unsolicited publicity resulting from their high-quality, innovative designs. As a result, products bearing the Universal Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from Plaintiff. Universal Products have become among the most popular of their kind in the U.S. and the world. The Universal Trademarks have achieved tremendous fame and recognition which has only added to the inherent distinctiveness of the marks. As such, the goodwill associated with the Universal Trademarks is of incalculable and inestimable value to Plaintiff.

14. True and correct copies of the records from the U.S. Copyright Office website for the copyrights associated with the Universal Films and listed above (collectively, the "Universal Copyrighted Works") are attached hereto as **Exhibit 2**.

15. Since first publication, the Universal Copyrighted Works have been used on the Universal Products and are currently featured on Plaintiff's website at shop.universalorlando.com. Universal Products featuring the Universal

Copyrighted Works are advertised on Plaintiff's website at shop.universalorlando.com and on Plaintiff's Amazon store.

16. The success of Plaintiff's brand has resulted in significant counterfeiting of the Universal Trademarks and copying of the Universal Copyrighted Works. Consequently, Plaintiff has a worldwide anti-counterfeiting program and regularly investigates suspicious e-commerce stores identified in proactive Internet sweeps and reported by consumers. In recent years, Plaintiff has identified numerous fully interactive e-commerce stores, including those operating under the seller aliases identified in the Complaint (the "Seller Aliases"), which were offering for sale and/or selling unauthorized and unlicensed products using infringing and counterfeit versions of the federally registered Universal Trademarks and/or unauthorized copies of the Universal Copyrighted Works (the "Unauthorized Products") to consumers throughout the United States.

17. I perform, supervise, and/or direct investigations related to Internet-based infringement of the Universal Trademarks and Universal Copyrighted Works. Our investigation shows that Defendants are using the Seller Aliases to sell Unauthorized Products from foreign countries such as China to consumers in the U.S. and elsewhere. I, or someone working under my direction, analyzed each of the e-commerce stores operating under the Seller Aliases and

determined that Unauthorized Products were being offered for sale to residents of the United States. This conclusion was reached through visual inspection of the products listed for sale on each e-commerce store, the price at which the Unauthorized Products were offered for sale, other features commonly associated with e-commerce stores selling unauthorized products, and because Defendants and their e-commerce stores do not conduct business with Plaintiff and do not have the right or authority to use the Universal Trademarks or copy the Universal Copyrighted Works for any reason. In addition, each e-commerce store offered shipping to the United States. True and correct copies of screenshot printouts showing the active e-commerce stores operating under the Seller Aliases reviewed are attached as **Exhibit 3**.

18. Defendants have targeted sales to United States residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, accept payment in U.S. dollars and/or funds from U.S. bank accounts, and, on information and belief, have sold Unauthorized Products to residents of the United States.

19. Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet

stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars and/or funds from U.S. bank accounts via credit cards, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. Plaintiff has not licensed or authorized Defendants to use any of the Universal Trademarks or copy or redistribute the Universal Copyrighted Works, and none of the Defendants are authorized retailers of genuine Universal Products.

20. Many Defendants also deceive unknowing consumers by using the Universal Trademarks without authorization within the content, text, and/or meta tags of their e-commerce stores to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Universal Products. Other e-commerce stores operating under seller aliases omit using Universal Trademarks in the item title to evade enforcement efforts, while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Universal Products.

21. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading,

and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

22. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

23. Defendants are collectively causing harm to Plaintiff's goodwill and reputation because the effect of their unlawful actions taken together amplifies each harm and creates a single negative consumer impression. Defendants' activities, occurring at the same time and in the same retail space and manner as one another, blend together to create a single negative impression on consumers such that they constitute the same occurrence or series of occurrences. The combination of all Defendants engaging in the same illegal activity in the same time span causes a collective harm to Plaintiff in a way that individual actions, occurring alone, might not.

24. E-commerce store operators like Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn and kuajingvs.com regarding tactics for

operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

25. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation in spite of Plaintiff's enforcement. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Plaintiff.

26. Defendants are working to knowingly and willfully import, distribute, offer for sale, and sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiff, have knowingly and willfully used and continue to use the Universal Trademarks and/or copies of the Universal Copyrighted Works in connection with the advertisement, distribution, offering for sale, and sale of Unauthorized Products into the United States over the Internet.

27. Monetary damages cannot adequately compensate Plaintiff for ongoing infringement because monetary damages fail to address the loss of control of and damage to Plaintiff's reputation and goodwill. Furthermore, monetary damages are difficult, if not impossible, to ascertain due to the inability to

calculate measurable damage in dollars and cents caused to Plaintiff's reputation and goodwill by acts of infringement.

28. Plaintiff's goodwill and reputation are irreparably damaged when the Universal Trademarks are used in connection with the offering for sale or sale of goods not authorized, produced, or manufactured by Plaintiff. Plaintiff's goodwill and reputation are also irreparably damaged when the Universal Copyrighted Works are reproduced, distributed, and/or displayed to the public without its permission. Moreover, brand confidence is damaged, which can result in a loss of future sales and market share. The extent of harm to Plaintiff's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

29. Plaintiff is further irreparably harmed by the unauthorized use of the Universal Trademarks and Universal Copyrighted Works because counterfeiters take away Plaintiff's ability to control the nature and quality of the Unauthorized Products. Loss of quality control over goods offered for sale or sold under the Universal Trademarks or that copy the Universal Copyrighted Works and, in turn, loss of control over our reputation, is neither calculable nor precisely compensable.

30. The use of the Universal Trademarks in connection with the offering for sale or sale of goods not authorized, produced, or manufactured by Plaintiff is

likely causing and will continue to cause consumer confusion, which weakens Plaintiff's brand recognition and reputation. Consumers who mistakenly believe that the Unauthorized Products they have purchased originated from Plaintiff will come to believe that Plaintiff offers low-quality products. Inferior quality products will result in increased skepticism and hesitance in consumers presented with genuine Universal Products, resulting in a loss or undermining of Plaintiff's reputation and goodwill. Indeed, there is damage to Plaintiff's reputation and goodwill even if consumers know that the goods they are purchasing are counterfeit. Prospective consumers who see inferior Unauthorized Products worn by others may mistakenly believe such goods to be genuine and may consequently develop a poor impression of Plaintiff and the Universal Trademarks. Such post-sale confusion results in damage to Plaintiff's reputation and correlates to a loss of unquantifiable future sales.

31. Plaintiff is further irreparably damaged due to a loss of exclusivity. Universal Products are meant to be exclusive. Plaintiff's extensive marketing efforts and innovative designs are aimed at growing and sustaining sales. The Universal Trademarks are distinctive and signify to consumers that the products originate from Plaintiff and are manufactured to Plaintiff's high quality standards. When counterfeiters use the Universal Trademarks to offer for sale or sell goods without Plaintiff's authorization, the exclusivity of the Universal

Docusign Envelope ID: 93DA0448-2695-423D-88E0-4B2B9DCE1DA0


Products, as well as Plaintiff's reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales.

32. Plaintiff will suffer immediate and irreparable injury, loss, or damage if an *ex parte* Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of July 2025 at Universal City, California.

Signed by:

67EB106E7FD8470...

Monique Cheng Joe